UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

In re:  Case No.: 15-12496-11

VINCENT G. HAMILTON and
And LINDA L. HAMILTON,

Debtors.

---

U.S. BANK TRUST, N.A., as Trustee for
LSF8 Mater Participation Trust,

Plaintiff,
v.  Adversary No.: 17-11

VINCENT G. HAMILTON, LINDA L.
HAMILTON, and PARK BANK

Defendants.

---

**MEMORANDUM DECISION**

Debtors Vincent and Linda Hamilton filed a chapter 7 petition on July 8, 2015. A month later it was converted to a chapter 11. U.S. Bank Trust, N.A., acting as trustee for LSF8 Master Participation Trust ("Plaintiff"), filed this adversary proceeding on February 15, 2017, seeking reformation of its mortgage and a declaratory judgment that its lien is superior to liens and interests held by Park Bank.

Plaintiff filed a Motion for Summary Judgment. On January 5, 2018, the Court held a status hearing on the matter. The Court granted reformation of the legal descriptions of the liens belonging to Plaintiff and Park Bank. The

parties agreed all available evidence was in the record and waived an evidentiary hearing. The Court then took the matter under advisement.

**FACTS**

Plaintiff and Park Bank each hold an interest in Debtors' real estate located at N1922 Summit Drive, La Crosse, Wisconsin ("Homestead"). The Homestead straddles two lots—lots 27 and 28. Debtors acquired lot 28 in 1995. Debtors intended to build a house on the land, but a year later determined the house would not fit on the lot so they purchased adjacent lot 27. Each lot has a different street address on Summit Drive: lot 28 with N1922 and lot 27 with N1914. Debtors have only used the address associated with lot 28.

Debtors financed the construction of the Homestead through three loans with Trane Federal Credit Union ("Trane Loans"). All the Trane Loans were secured only by lot 28 and were properly recorded.

As built, the Debtors' home primarily occupies lot 27. The mailbox, part of the garage, and driveway are on lot 28. On September 25, 1997, Debtors refinanced the Trane Loans with a loan from The Money Store in the amount of $360,000 ("1st TMS Loan"). The Trane Loans were satisfied, and The Money Store was granted a mortgage on lot 28. The mortgage was filed in La Crosse County on October 1, 1997 ("1st TMS Mortgage").

Debtors refinanced the 1st TMS Loan on November 20, 1998, and that mortgage was satisfied on December 14, 1998. This time, Debtors took out two mortgages in the amounts of $405,000 and $40,000 (collectively, the "1998

TMS Mortgages." Yet again, the mortgages listed only lot 28 as security. These mortgages were recorded on May 12, 1999.

In the gap between satisfaction of the 1st TMS Mortgage and recording of the 1998 TMS Mortgage, the Debtors granted a real estate security agreement ("RESA") in the Homestead to Park Bank. It secured a 1999 loan. Prior to the execution of the loan documents and the RESA, Debtors prepared and delivered a handwritten financial statement to Park Bank. That statement listed one mortgage on the Homestead to The Money Store in the amount of $437,487. The handwritten financial statement was then put into typed form dated February 24, 1999 and signed by Debtors (the "PFS"). The PFS listed not one but two mortgages to The Money Store on the Homestead in the amounts of $473,487 and $40,000. The RESA contained the Homestead address, but only identified lot 28 as security. The RESA was recorded on April 19, 1999. The Park Bank debt is also secured by Debtors' business property, including real property located at 432 Cass Street, La Crosse, Wisconsin. The Park Bank note was executed to fund the expansion of Linda Hamilton's chiropractic business at the Cass Street location. Plaintiff alleges Park Bank is owed between $130,000 and $150,000.

On January 21, 2004, the Debtors refinanced the 1998 Money Store loans with Ameriquest Mortgage Company. Debtors borrowed $486,000 (the "Home Note"). The Home Note paid off the 1998 TMS Mortgages. It also advanced new money to satisfy other debts. Debtors executed a mortgage to secure the Home Note that, again, only listed lot 28 as security. The 1998 TMS

3

Mortgages were satisfied and released on February 10, 2004. The Ameriquest Mortgage was recorded on February 2, 2004 ("Ameriquest Mortgage"). The Home Note and Ameriquest Mortgage were assigned to Mortgage Electronic Registration Systems, Inc., then to Household Finance Corporation III, and finally to Plaintiff on September 15, 2015. Each of the assignments were properly recorded with La Crosse County.

Debtors vacated the Homestead in 2012. The Homestead was sold in a section 363 sale during their bankruptcy. Debtors' counsel is currently holding $130,157.31, which represents the net proceeds of that sale.

As a result of summary judgment on its reformation claim, the Ameriquest Mortgage and the RESA encumber both lots 27 and 28. The issues remaining are whether Ameriquest holds a priority interest over Park Bank and whether it is entitled to require marshaling of Park Bank's other collateral.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (applied through Fed. R. Bankr. P. 7056). The Court must view all facts and indulge all inferences in the light most favorable to the Defendants and determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986).

As a procedural matter, on summary judgment "the burden is on the moving party to establish that there is no genuine issue about any material

4

fact, or that there is an absence of evidence to support the nonmoving party's case, and that the moving party is entitled to judgment as a matter of law." 20 Charles Alan Wright, Arthur R. Miller & Edward Cooper, *Federal Practice and Procedure* § 105 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

The parties stipulate the only material facts that can be presented are in the record. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). Because the parties all stipulate that no facts beyond those in the record can be presented, the Court must determine the remaining claims based solely on that finite universe of facts.

## II. *Order of Priority*

Plaintiff asserts two theories on which it would have priority over Park Bank. First, Plaintiff claims Park Bank had actual notice of the prior mortgages and therefore would not have priority. Second, Plaintiff argues that Park Bank's claim should be equitably subordinated to its interest.

### A. *Race-notice and actual notice*

Wisconsin law governs the priority of interests in land. For purposes of determining priority, Wisconsin is a race-notice state. Wis. Stat. § 706.08(1)(a) provides:

> [E]very conveyance that is not recorded as provided by law shall be void as against any subsequent purchaser, in good faith and for a valuable consideration, of the same real estate or any portion of the same real estate whose conveyance is recorded first.

Regardless of when the mortgages were executed, whoever recorded the mortgage first would have priority absent actual notice.

5

The 1998 TMS Mortgages were executed on November 20, 1998, but not recorded until May 12, 1999. Park Bank's RESA was executed on April 15, 1999—after the 1998 TMS Mortgages were executed—but was recorded on April 19, 1999. At the time the PFS was given to Park Bank, the 1st TMS Mortgage was of record in the amount of $360,000. That mortgage was released, however, before the RESA was granted and recorded. The 1998 TMS Mortgages were executed before Park Bank's mortgage, but Park Bank's was recorded first. Therefore, strictly under the race-notice analysis, Park Bank would have priority.

A strict race-notice analysis does not end the matter. Under Wisconsin law, "[s]omeone who actually knows about a prior claim or interest cannot claim the benefit of the recording statute." *In re Thulis*, 474 B.R. 668, 674 (Bankr. W.D. Wis. 2012). Even though Park Bank recorded first, it would still be subordinate to the 1998 TMS Mortgages if it had actual or constructive notice of The Money Store's interest. *Id*. "Actual notice means exactly what it says. Someone who actually knows about a prior claim or interest cannot claim the benefit of the recording statute." *Id*.

Park Bank clearly had notice of the Money Store's mortgages at the time of the RESA. In anticipation of the loan with Park Bank, Debtors filled out a Personal Financial Statement. The PFS discloses the existence of two "current" mortgages against the Homestead, both held by The Money Store and with outstanding balances. Thus, Park Bank was on notice of the prior claims of The Money Store.

Park Bank asserts it "likely believed" the mortgages listed on the PFS were the 1997 mortgages, which had been satisfied in December 14, 1998. Therefore, Park Bank claims, it did not have actual notice of the 1998 TMS Mortgages.

Park Bank's claim in this instance is not credible. First, Debtors completed the PFS in February 1999. If the 1st TMS Mortgage had been satisfied in December 1998, it would have been senseless for Debtors to list the mortgages as "current" and with an outstanding balance in February of 1999.

Second, the 1997 mortgage was one mortgage for $360,000. The PFS lists two separate mortgages on the Homestead with balances of $473,487 and $40,000. This was an update and clarification of the single mortgage listed on the handwritten financial statement. The information in the PFS placed Park Bank on notice. There is no evidence they checked the real estate records or were told those mortgages had been paid. It is convenient but unbelievable that Park Bank honestly thought that over $400,000 in mortgages were suddenly paid and released.

Park Bank had notice of the 1998 TMS Mortgages by virtue of Debtors' PFS. Because Park Bank had actual notice, Plaintiff is therefore entitled to priority to the extent of the balances on the 1998 TMS Mortgages that were actually paid and refinanced by the Ameriquest Mortgage. Any additional advances by Plaintiff do not have priority.

B. *Subrogation*

Plaintiff also asserts it is entitled to equitable subrogation. Under equitable subrogation, "a lender will be granted subrogation where money is advanced in reliance upon a justifiable expectation that the lender will have security equivalent to that which his advances have discharged." *Rock River Lumber Corp. v. Universal Mortg. Corp. of Wisconsin*, 82 Wis. 2d 235, 241, 262 N.W.2d 114, 117 (1978). "Subrogation is an equitable doctrine invoked to avoid unjust enrichment, and may properly be applied whenever a person other than a mere volunteer pays a debt which in equity and good conscience should be satisfied by another." *Ocwen Loan Servicing, LLC v. Williams*, 2007 WI App 229, ¶ 7, 305 Wis. 2d 772, 741 N.W.2d 474 (Wis. Ct. App. 2007).

To invoke subrogation, a lender must have either: (1) lent money to a debtor to pay a debt on which the lender was secondarily liable; (2) must have lent the money to protect the lender's own interest; or (3) must have entered into an agreement that the lender was to have security on the debt. *Ocwen Loan Servicing*, 2007 WI App 229, ¶ 7. The third means of invoking subrogation would be the only path applicable here. However, in light of this Court's conclusion that Plaintiff is entitled to priority, the Court need not address subrogation.

C. *Marshaling*

Plaintiff also argues the Court should apply the doctrine of marshaling. Marshaling stands for the principle "that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another

8

creditor, who may resort to only one of the funds." *In re Wm. Pietsch Co.*, 200 B.R. 207, 209 (Bankr. E.D. Wis. 1996). If required to marshal, Park Bank would be directed to collect its debt from the Cass Street property first, then seek the remainder from the Homestead. The elements of marshaling are:

>   (1) the existence of two creditors of the same debtor; and
>
>   (2) the existence of two funds belonging to a common debtor; with
>
>   (3) only one of the creditors having access to both funds; and with
>
>   (4) the absence of prejudice to the senior secured creditor if the doctrine is applied.

*Id.*

Plaintiff argues the Cass Street property is worth about $450,000, which would greatly exceed the $150,000 Debtors owe Park Bank. Plaintiff, meanwhile, is only secured by the Homestead. Elements (1) through (3) of the marshaling test have been satisfied. The remaining question is whether Park Bank would be prejudiced by the Court's application of marshaling.

Debtors apparently agree the Cass Street property is worth about $450,000, though their schedules state they believe it is worth $425,000. Also assuming a forced sale discount of 10%, that would mean the Cass Street property could sell for about $405,000. There are about $213,768.79 in real estate taxes attached to the Cass Street property that would take priority over Park Bank's interest. After paying the taxes, that might leave $191,231.21 to pay Park Bank's claim.

This assumes, however, there is a sale of the Cass Street property. No sale is proposed. Neither is it certain an actual foreclosure sale would occur or would realize enough to satisfy all the claims against the property.[1] Under the hypothetical above, there would be a cushion of about $40,000 for Park Bank's claim. But, if the discount on the sale rose to 20%, then Park Bank would no longer be able to fully satisfy its claim. The parties have not filed appraisals. The Court assumes, based on the stipulations of the parties, the $450,000 valuation of the property is close to accurate. Consequently, it is also unclear whether Park Bank would be prejudiced in a foreclosure. Plaintiff has failed to meet its evidentiary burden in showing a sale would not prejudice Park Bank.

Debtors' proposed treatment of Park Bank would likely result in an extreme delay in payment to Park Bank, an increase in Park Bank's risk, and—for purposes of the marshaling analysis—prejudice. Debtors have not provided any evidence of their efforts to obtain refinancing and there is no evidence Debtors might be ultimately successful in doing so. There is simply too much uncertainty in the proposed treatment of Park Bank and substantial risk the additional collateral will be insufficient. For that reason, Park Bank would be prejudiced if this Court required marshaling. Plaintiff has failed to satisfy the final prong of the marshaling test.

---

[1] Plaintiff did not file a motion for relief from stay, but it nonetheless requested the Court to grant relief from stay on the Cass Street property in its brief. The Court does not consider that request a motion for relief from stay. A separate motion is required.

In sum, Plaintiff failed to satisfy its burden of proof on this issue. It is clear Park Bank would in fact be prejudiced by the application of marshaling and therefore the claim for marshaling is denied.

## CONCLUSION

The Court grants Plaintiff's Motion for Summary Judgment with respect to priority of its mortgage. The Court denies the Plaintiff's marshaling claim.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: January 25, 2018

BY THE COURT:

Hon. Catherine J. Furay
U.S. Bankruptcy Judge